Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Good morning. Good morning. Good morning. Good morning, Judge Bernard and Judge Gibney. I apologize that I'm not there. I regret that I'm not there in person to sit with you, but I had some travel issues on  And also to counsel, I regret that I am not there in person, but we had some travel issues yesterday as did, I think, counsel in our second case. And so we will, I will be appearing remotely and we are ready to begin. We will start with our first case, which is number, case number 25-1409, Environmental Hydrogeological Consultants v. North American Risk Services. And Mr. Armstrong? Yes, Your Honor. All right. Yes, sir. Thank you. Thank you, Your Honor. May it please the Court, my name is Lamar Armstrong. I'm counsel for the plaintiff appellant in this case, Environmental Hydrogeological Consultants or EHC for short. Hog waste was freely flowing. The neighbor's properties and indeed their livelihoods were at stake. North Carolina Department of Water Quality was on the insured Legacy Biogas' case to do something about it then. So Legacy Biogas told EHC, the contractor, wait until Admiral, the insurance company, approves the coverage, approves the cleanup costs. Soon thereafter, the defendant, Mr. Scroggs, told Legacy Biogas, Admiral, we'll pay the cleanup costs. That message was directly conveyed to EHC and EHC proceeded to invest over $400,000 in cleanup costs over the next three and a half weeks. Now, in this emergency situation, one person held the keys to the truth and that was Mr. Scroggs. And he didn't have to act. He didn't have to say anything at all. This isn't, let me be clear, this is not about establishing or defining a standard of care for insurance adjusters. This is about the fact that Mr. Scroggs made a choice. He chose to speak. And when he chose to speak, he assumed a duty to do simply nothing but tell the truth. It's that simple. That's what Raritan, the North Carolina Supreme Court case that controls the claim here, says. And so we have this debate about duty because what we're really talking about is two different types of duties. There's the specific duty defined by the Raritan case in a negligent misrepresentation context and a commercial context. But Raritan is not a case in the context of an insurance adjuster speaking to a third party that's not a party to the contract. And it's never been applied, as far as I can see, by the North Carolina Supreme Court or really any court to apply to a situation like this where it's an adjuster speaking to a third party and not to a party to the contract. And so why should we as a sitting in diversity as a court of appeals essentially extend North Carolina itself has never extended it? Good question, Judge Barnard, for a couple of reasons. One, because the Raritan rule has been applied in the insurance professional context a couple of times. Our brief cites to the Hunter case in which the rule was applied to a life insurance company as well as the Middleton case which was applied to a health insurance company. In the Middleton case, in particular, the North Carolina Were those adjuster cases? No, those were insurance company cases, insurance professional cases. Those cases are not dependent adjusters? No, sir. No, sir. But Koch or Koch, however you say it was? Koch was a case by the North Carolina Court of Appeals that, yes, it applied to insurance adjusters, but it never mentioned the Raritan rule. It didn't apply it one way or the other. And so the Middleton case cited in our brief is particularly noteworthy because the North Carolina Supreme Court in that case denied a petition for discretionary review. So it declined to take it up on review and say, clarify and say that, no, the Raritan rule does not apply to insurance professionals. It was only meant to apply to the accounting field, which was the underlying facts of that case. But it declined to do that, and that's noteworthy. And so the different duties, and Judge Gibney, to your question, the Koch case, the Koch case starts out in the procedural history and context of that case. It lists out all the different claims that the plaintiff brought, including negligent misrepresentation and including ordinary or simple negligence, among others. But the actual substantive body of that opinion doesn't mention, much less address, negligent misrepresentation. And is the duty different as a matter of law under North Carolina law for negligent misrepresentation and negligence? Yes. In fact, there are two. How does it differ? It differs because negligent misrepresentation, as defined in Raritan, as defined in the North Carolina pattern jury instructions, is limited to, I mean, it's the same duty of care, but it's limited to the circumstances. It's limited to a commercial context where one speaks about knowledge or information that they know or have access to, and so when they choose to speak, they assume a limited duty to do something to inform themselves of the truth of what they're talking about because they know in that context that someone's going to rely on what they have to say. And so the Koch case, it's not a negligent misrepresentation case. It mentions the claim once in the procedural history, but then it doesn't address it, doesn't address Raritan. And, in fact, all of the cases that it cites to in other jurisdictions on this point about duty are not negligent misrepresentation cases. They're all simple negligence cases. What about Cedarbrook? Because in Cedarbrook, the North Carolina, I'm also mindful that my colleague Judge Benjamin is on Zoom, and I want to make sure she's able to get in. But I am concerned about Cedarbrook because it relies on Koch, and it is a case that is a subsequent and a very recent case of the Supreme Court of North Carolina. And so I am concerned that that case does adopt and incorporate Koch into it and suggest perhaps that we, too, must follow Koch here. Yes. So, Your Honor, Cedarbrook is concerned, as is Koch, about creating conflicting duties of care. And we fully agree that, Mr. Scroggs, nobody should be put in a position to, on the one hand, have a contractual duty to act in the best interest of their client, the insurance company, but on the other hand, assume a duty of care that's somehow conflicting with the other duty. Let me ask you about that because my reading Cedarbrook, it seems as if the North Carolina, in that case, the North Carolina Supreme Court is saying we're not going to get into creating conflicting duties of care. Not so much that there's this conflict, as you're saying, but they're basically saying we're not going to create. And then they also do, once again, cite Koch, this Koch case, which seems to square up pretty, seems to square up with this case in terms of the adjuster and the negligent misrepresentation. So, Judge Benjamin, the Cedarbrook case addresses a situation where the plaintiff was an owner-operator of an adult home care facility. And it sued the North Carolina Department of Health and Human Services because it alleged that DHHS negligently inspected and took adverse licensure actions against it. So, in other words, they were asserting that DHHS had a duty to act in the owner-operator's best interests. What the North Carolina Supreme Court held there is that, no, the duty that DHHS has is to act in the best interests of the residents of the facilities, not the owners. But, again, that goes back to what I was saying earlier, which is that here we're not alleging a duty to act. We're not saying that Mr. Scroggs had a duty to act in EHC's best interests as opposed to his client's best interests. He could have done nothing at all, but he chose to speak. And then once you choose to speak, that takes it out of the line of authority of Cedarbrook and Koch, where you're evaluating what must someone do to act in someone's best interests, and it brings it into the rarity line of authority where the choice has already been made. He spoke. Now that he's done that, understanding that people are going to rely on what he has to say, he's got to do so with reasonable care. So that's the difference. That's the distinction. Let me ask you another question about that, because just so I wanted to make sure I had a good understanding. So when you say on this whole reliance, once he decided to speak, because I think the other side's argument is that he spoke to, I think it's Balances is the way you pronounce the last name, Mr. and Mrs., but I do know that there was an invoice, that they sent the invoice, and then Scroggs responds to them regarding the invoice. Is that the reliance that you're, the direct reliance that you're discussing, that your claim is based on? Yeah, it's two stages of reliance, Judge Benjamin. It's the first stage, which is once EHC was told, don't begin the work until the insurance company approves the claim, and then they were immediately told, insurance companies approve the claim, you may begin. So there's the reliance there on that initial representation. There's also the continuing reliance. But that initial representation is between, my understanding is that initial representation is between the Balances and your client, not Scroggs. My understanding is Scroggs is talking, speaking to, communicating with the Mr. and Mrs. Balance, right? The initial representation, correct. Yes, Judge. And they're communicating with your client. Yes. But at some point, your client sends, so the argument there is that that's a conversation between the Balances and the adjuster. But then at some point, your client sends an invoice and does have a discussion, right? Yes, so four times after the initial misrepresentation, EHC actually directly communicates with Mr. Scroggs and says, where's payment on our invoices? Until the very end, until after they were done doing the work and incurring the over $400,000 in costs, the response was, let me look into it for you. Let me look into payment. It may not be paid. It's still under investigation. And so there's a continuing reliance. There's the initial reliance, but there's also the continuing reliance as they continue to do the work and pump out the hog waste that, you know, essentially, you're going to get paid. Let me look into it. It's just a matter of when, not if. And then, excuse me. Those continuing statements, were those directly, just to follow on Judge Benjamin's questions, between the insurance adjuster, Scroggs, and your client? Or were they essentially sort of via the company? No, the former. They were all directly to EHC, my client. So you sort of analogize this to, it's as if Mr. Scroggs was an auditor and prepared an audit report that he gave on behalf of his client, but it was of value to investors. And for that reason, he should be liable. Is that right? Yes. He knew when he spoke that the insured legacy biogas would use that information to hire a contractor and to get the work done, and that specifically played in the complaint. Yes, Judge. But doesn't he have conflicting interests? I mean, on the one hand, he's got Admiral's interest. On the other hand, he's got Mr. DeBalance's interest. And on the third hand, he's got your client's interest, which are all separate and go in separate ways. Before he chose to speak, I would agree with that. After he chose to speak, if there's interest, they're all in alignment, that he is to tell the truth or do what he can to tell the truth. That may not be the case with Admiral. I mean, Admiral may say, your interest to us is to deny coverage. Well, I think Admiral would say that our interest is in having our agents speak the truth when they're speaking about coverage to anybody. I don't think any insurance company wants their agent out there misrepresenting facts about coverage, nor would anybody else. So I think the interests actually are in alignment once Mr. Sparks chose to speak. They're moral interests, but maybe not their fiscal interests. Their legal interests, I would argue, Judge. So back to the issue of there being an adjuster in this case, because the two cases that you pointed us to at the beginning of your argument, Middleton and Hunter, neither of them involved an adjuster. It was just a direct communication between the insurance company and the claimant. Is that right? So is it your argument here that it's sort of irrelevant that this is an adjuster, that he's acting as the agent, and therefore we should find that as the adjuster, he is essentially the same as the insurance company? Is that your argument? It's irrelevant in the sense that the Raritan rule is a generally applicable rule. It's not a rule that was adopted only for the accounting field or for the insurance adjustment field or any other type of field. The rule says in any commercial context in which someone speaks, they have a duty to, and they speak in the course and scope of their employment or their agency, they have a duty to inform themselves of that which they're talking about. Was Scroggs an agent of the balances? Scroggs was an agent of the insurance company. Okay. But not of the balances. Correct. So he couldn't have made a contract with your client. That's correct. And if the duty is based upon relationship, that would matter. And so the defendants, they make this argument about, well, some of the cases the duty is extended to an insured but not a non-insured, but that's only if the relationship is what gives rise to the duty, right? Because if you're an insured, you have a preexisting contractual relationship with the insurance company and then at least arguably the insurance company's agent, whereas if you're a non-insured, you do not. But again, here we're not saying that the duty arises out of any preexisting relationship. There was no preexisting relationship between EHC and the defendants. The duty only arises once there's a decision to speak. I see that I'm out of time. With your permission, I'd like to save my remaining time for rebuttal. All right. Any other questions, Judge Byrne, Judge Gabor? No. All right. Thank you, counsel. Thank you. All right. Next we will hear from, is it Mr. Badar? Bader, Your Honor. Thank you.   Good morning. May it please the Court. Stephen Bader here on behalf of the defendant, Apple E. It's North American Risk Services and Randy Scruggs. This court should affirm dismissal for the defendants because EHC's sole claim for negligent misrepresentation fails under North Carolina law because an independent insurance adjuster does not owe a duty of care to a non-insured third-party claimant. That's the Court of Appeals holding in Koch. That holding was cited with approval by the North Carolina Supreme Book in Cedarbrook as an example of a case where North Carolina does not impose a duty of care because of potentially conflicting loyalties that a duty would impose on the defendant. Let me ask you about this argument that he has, that he's making, that this case falls into rarity because there's no initial duty, but once he voluntarily spoke with EHC, the duty arises at that point. I don't think that's correct for a couple reasons. I think, first of all, that same sort of idea of a voluntary communication also occurred in the Koch decision. In Koch, there's direct communications between the independent insurance adjuster and the third-party claimant, and that fact didn't bring that case into rarity or really the restatement second of torts 552. I would point out that when this court looks at the briefing in Koch, if it's inclined to do so, that was one of the arguments that was made and the North Carolina Court of Appeals did not find that availing. The second thing is the direct communications, and this is sort of the secondary argument that we made as to justifiable reliance, the direct communications between Mr. Scroggs and EHC don't start until June 7th. Now, the claim is apparently reported on June 1st. There is communications alleged between Mr. Scroggs and legacy biogas as principals that day, but the first communication between EHC and Mr. Scroggs is on June 7th, where Mr. Scroggs is alleged to have said, I've just obtained information on this recently, would be getting a report to Admiral, I'm sorry, and then later follows that with a letter that says he's getting further direction from the carrier and would let EHC know when he hears from them. So that communication seven days after the purported claim is not an acknowledgment of coverage. The idea, I guess, would be that by not disclaiming coverage he somehow made an affirmative representation, but there would be no factual or legal support for that idea. Raritan certainly doesn't get to that, and Koch doesn't suggest that the mere fact that the communications are direct ultimately gives rise to a stated claim. So could environmental hydro geological consultants, they could have sued the balances or whatever their company was called, right? Yes, and I believe that they have. They have. I think that case is pending, I believe. And then can the balances bring in, can they sue their insurance company and NARS? They could, and that claim is also pending in the inverse. There is a declaratory judgment action pending on coverage as between those parties. Okay. And under North Carolina law, could environmental hydro geological sue Admiralty? Sue Admiral Insurance? Yeah. I think in general, your Honor, no, as a third-party claimant that they would. They'd have to sue balance, and then balance could bring its insurance carrier in. Right. So what's the status of all that? The federal declaratory, this is the best of my knowledge, so if I misspeak, it's only just in reviewing the file. The federal declaratory judgment action is pending before Judge Flanagan. That's the case as between Admiralty and Legacy Biogas with EHC joined in that action. And then there is a separate action that's pending in North Carolina State Court. I believe that is between EHC and then Legacy Biogas. Admiralty would be a party to that as well, but I don't want to misspeak.  Thank you. But there are, in effect, three different lawsuits that are all stemming from this event. But as to this claim and the claims against NARS and Scruggs, this is a dead ringer for what happened in Coke. I mean, in that instance, you had. Your friend on the other side says that Coke is about negligence and not about negligent misrepresentation at base. And so that is one difference. And the other concern I have is that Coke is not a Supreme Court decision of the states, and it's an intermediate court decision and that Raritan is not only a decision of the North Carolina Supreme Court, it's been followed repeatedly by the North Carolina Supreme Court in many other contexts. And so to me it seems that that is the authority that we are bound to follow. I'll try to address those different concerns in the order that I think I heard them. So Coke involved claims for negligence, negligent misrepresentation, negligent failure to warn. There was also an unfair and deceptive Trade Practices Act claim. What the Coke court looked at was the idea of where does the duty arise. And it says that an independent insurance agent is hired and has contractual obligations with the carrier. That is who it's taking its directions from. And so what the court was concerned with was, and Judge Gibney pointed this out, it can't have loyalties to the carrier that hired it, as well as the insured that has a certain interest, and then an even more tenuous relationship with the claimant, which in this case would be EHC. In surveying how different states have handled it, the North Carolina Court of Appeals said that the majority rule is to find no duty of care in these scenarios. And even in the minority decisions where such a duty was found, that would be a duty to the insured and not to a third party claimant. In the context of negligence, but here we have a situation where there's a representation that there was an affirmative statement, and so it's not a claim for negligence. It's a claim for negligent misrepresentation. And so the duty would arise not out of the contract, but rather out of the statement, or at least that's the contention your friend on the other side is making. Yes, Judge, but, and I didn't articulate this very well the first time. I mean, there was a negligent misrepresentation claim in Coke. And the Court of Appeals said, we're still looking fundamentally at is there a duty in this case. And the reason that there's not a duty isn't because the claim originates as opposed to something said, as opposed to something that was done or not done, but it arises because of the relationship between the parties, and because of the potential for conflicting loyalties, a duty would not be recognized in that scenario, which is what the Supreme Court then cited with approval in Cedarbrook. So he could just sign a contract with the cleanup company to say, go ahead and do it, Admiral will pay it, but he doesn't have any authority to do that. Is that what you're saying? That Mr. Scroggs could do that? Yes. I'm not sure I'm necessarily saying. He could send a letter to, well, maybe he did send a letter to Environmental Hydrological that said, go ahead with this, we'll take care of it. That just doesn't seem right. He didn't do that, though. Well, okay, he did it on the phone. But not to them. Not to EHC. He didn't have any. Well, he had some contact with Mr. Your opponent says he had some contact with the cleanup people. The narrative as pleaded, Judge, is that on June 1st, this claim is reported by Legacy Biogas, really to the risk administrator, then to Mr. Scroggs. The allegation is Mr. Scroggs that day has a phone conversation with Deborah Balance, who's one of the principals of Legacy Biogas. After that conversation, then Todd Balance, the other principal, calls EHC and says Admiral's going to cover this. There's no communications on that date between EHC and Mr. Scroggs. Later was there? The first communication is on June 7th, seven days later, at which point, according to the complaint, they call Scroggs and what Mr. Scroggs says is he just obtained information recently on this and he would be reporting to Admiral. He then is alleged to have followed that up with a letter that says he's getting further direction from the carrier and would let EHC know as soon as he heard from the carrier. That's not a representation as to coverage at all. And then the next communication would be, well, there's an allegation that eight days. They got hog slop going all over the hillside and, you know, the environmental authorities are all over the balances to clean it up. And this guy says, yeah, we'll cover it. So they go and hire somebody. That just doesn't seem right to me then to be able to go back on that. Let me address that squarely just to make sure that my argument is at least clean in my own head, that that would really get to the alternate argument that the district court did not get to, which is that to plead negligent misrepresentation, the plaintiff has to show justifiable reliance. And that doesn't exist here in two forms. First of all, there's no allegation that they relied on anything directly that they heard from Mr. Scroggs about coverage. I won't repeat the narrative that I just went through in the complaint, but there is no allegation anywhere in this complaint that Mr. Scroggs made a representation to EHC that this claim was covered. The allegation to the contrary is that the representations he is making directly to them are that he is reporting to the carrier, getting information, and that he'll follow up when he hears. I heard my friend say that Mr. Scroggs, you know, held the keys or something to that effect. And I would disagree with that. There is nothing that prevents EHC in the reasonable reliance aspect of justifiable reliance to simply asking Mr. Scroggs for a commitment as to coverage before it undertakes any work. This is a sophisticated business entity. They understood the nature of working with third-party insurance carriers, and they could have asked for something to that effect, and that would be part of the reasonable reliance to pursue a negligent misrepresentation claim. Had they had that, perhaps this case is different. There's still duty issues, but at least they would be able to argue that as it stands. Really what they're saying is we have a third-hand comment from a principal of this insured committing the carrier to coverage via a statement made by an independent insurance adjuster. That is far beyond the scope of the type of liability that the court, the North Carolina Supreme Court, said may attach in Raritan River Steel. And to get back to Judge Berner's sort of question about how the Supreme Court or really North Carolina courts in general have applied Raritan River Steel since its decision, they have not applied that section of the restatement of torts to impose liability in scenarios where you may have these potentials for divided loyalty. Just looking at the four cases that my friend cites in their reply brief, some of which have been discussed, you know, Middleton versus Russell Group, that was a plaintiff suing their former employer and a health insurer about representations that were made about health insurance coverage. There was no independent adjuster or anybody with potentially divided loyalties involved in that case. Hunter versus Guardian Life Insurance, effectively the same posture. The other two cases, Sanford and Schaffner Industries, are both decided before Raritan. Neither cite the restatement second of tort section 552, and neither involve scenarios where there could be the potential for divided loyalties. But what section 552 talks about is, and I have it in front of me, where one in the course of his business, professional employment, or in any other transaction in which he has a pecuniary interest, I think it's fair to say that your client is a professional and had an interest in this transaction, supplies false information for the guidance of others in their business transactions, is subject to the liability for pecuniary loss caused by them by justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating the information. I think this is, you know, we're at a motion to dismiss stage, and that seems, based on the facts alleged in the complaint, to be exactly what is being alleged. Well, Koch was also decided at the motion to dismiss phase, and again, what the North Carolina But again, the North Carolina Supreme Court adopted section 552 of the restatement of torts, which is what I just read from. I agree with that, but just because that has been adopted doesn't necessarily mean that it applies to any and all claims that are alleged, and what the North Carolina Court of Appeals said in Koch is, that doesn't stay at a claim because there is an absence of duty because of the conflicting loyalties. And when we go back to the Raritan decision, that issue that the Supreme Court flagged in that case was the scope of an accountant's liability for others apparently relying on their work product, and the North Carolina Supreme Court says there's four different approaches that we may pick from to decide how to judge liability in a potential case like this. And the Supreme Court decided that section 552 was sort of the best balancing test, because what it did was it would hold accountants potentially liable when they know or have reason to know that other persons may rely on their work product, but not necessarily in situations where what they say is being repeated to others and others. And the court said... Well, I think the allegation here isn't about what's being repeated to others. I think the allegation here is about the direct statements that were made. Well, I disagree with that, Judge Berner, because the only allegation here about coverage is that Mr. Scroggs made a statement about coverage to legacy biogas, to one principle of legacy biogas, a verbal statement on the phone, and that that verbal statement on the phone was apparently repeated from one principle of legacy biogas to the other, who then repeated that representation in different form than to EHC. Mr. Scroggs has never alleged... What about the June 8th letter? What about the June 8th letter? The June 8th letter did not go to EHC. That June 8th letter was... No, but to the balances. And said that there's coverage. Well, I don't think it quite went that far. I think what it referred to is what is available under the insurance policy. But I think more important for purposes of this case, that letter was not sent to EHC. That was a letter from Mr. Scroggs strictly to the balances. There's no allegation that that letter was sent to EHC, that that was something that they relied upon, or any allegation that in following up with Mr. Scroggs about the status of the claim, that that was something that they were following up on or asking about. Again, their communications with Mr. Scroggs that they've pleaded and alleged is that they asked him for follow-ups, and Mr. Scroggs says, I'm reporting it to the carrier, and I will report back when I am able to. Well, one last question. But doesn't after this June 8th letter to the balances, that's when they go and say to EHC, hey, it's going to be covered? I don't believe that's the correct sequence of events. I think on June 1st, there's this literal and metaphorical game of telephone between Mr. Scroggs and Debra Balance. Debra Balance then talks to Todd Balance. Todd Balance then talks to EHC, and Todd says to EHC, Admiral's going to cover the claim. There's no pleaded allegations then that that June 8th letter is sent anywhere. Well, I guess to be more accurate, the legacy biogas sends that to EHC, or that EHC is somehow relying on that letter. The allegations subsequent to June 8th are that they have conversations with Mr. Scroggs where they are asking about the status of the claim, and he is reporting that he is getting information to Admiral and will report back when he is able. And that, again, really squares with the idea of what the North Carolina Court of Appeals held in Koch and what the Supreme Court addressed in, or what North Carolina Supreme Court cited with approval, rather, in Cedarbrook, which is there are just certain scenarios where because an individual is going to have conflicting loyalties, the law does not impose a duty of care. Judge Gibney has identified various scenarios or recourse where this coverage issue could be sorted out. But a scenario like this really almost invites abuse where you could have a third-party claimant say, well, I talked to the person who owes me money, and they told me that they talked to an independent insurance adjuster, and the independent insurance adjuster said that the carrier was going to cover that. And just by virtue of those second- and third-hand comments, you now have a claim for negligent misrepresentation. Koch rejects that. The North Carolina Supreme Court recognizes that is problematic in Cedarbrook, and that is certainly far beyond what is contemplated by Raritan, where a third party is actually looking at somebody else's work product and relying on that direct representation. No such communications occurred in this case. The best they could say was that they were relying on Mr. Scruggs' apparent silence as to coverage as an affirmation that coverage existed. So I know that the time is almost up, but I do have another question, Judge Benjamin. May I ask one more question? Yes. Thanks. So if this was a case brought by EHC for negligent misrepresentation against your client, based on the statements that were made by your client directly to EHC, would we be in a different- I'm sorry, to Legacy Biogas. Would this be in a different posture? Because there, too, it seems to me, there would be conflicting loyalties. In other words, Legacy Biogas and Admiral Insurance also potentially have conflicting loyalties. So why wouldn't we then say that there would be no negligent misrepresentation claim in that situation? And there it seems there would absolutely be a negligent misrepresentation claim. I want to make sure I'm helpful in answering your question, Judge. I'm not sure I totally tracked with the hypothetical. Okay. So the hypothetical is, if this was a case not by EHC against your client, but rather by- Legacy Biogas. Legacy Biogas against your client, where there is no question that the letter was written and there were statements saying that the contract would be covered, would there then also be conflicting loyalties under Koch in your mind? Potentially. Judge Flanagan, in another case that's cited in the briefing called Duck Village, said that in that scenario, despite the potential for divided loyalties, a claim could potentially stand as between the insured and the independent adjuster hired by the insured's first-party carrier to deal with the case. That is, of course, procedurally distinct here in a couple ways. It's not a first-party claim. It's a third-party claim. And the claim in bringing the case here, EHC, certainly has adverse interests. So it's procedurally different, but there's also a divided loyalty there. So divided loyalty doesn't necessarily defeat a claim of negligent misrepresentation. I'm not sure I necessarily, or rather I should say the North Carolina law necessarily agrees with that proposition. I think that what the Koch court recognizes is that independent insurance adjusters occupy a very unique space with who they are hired by, who they report to and are obligated to act in their best interests, and the various players that can come into place in different insurance disputes. Third-party insurance cases are going to be different from first-party insurance cases as far as the duties that insurers may have to the different players in that case. And so I don't think it's necessarily that narrow of a holding so much as a fact-specific holding as to what an IA does in a situation like this. And so because North Carolina law does not recognize the duty and because the plaintiffs have not pleaded justifiable reliance under Raritan Steele, we would ask this court to affirm. Thank you. May I ask a question? Yes, sir. Let's just take it in a slightly different context. Suppose I was trying to sell my house to you and I had inherited it from my distant uncle and I didn't know whether I had clear title to it, so I asked a lawyer to go do a title search on it and the lawyer hired a title company to do that. And the title company said to me, John, your title is clear. And I then told that to you. Could you sue the title insurance company over that? I think that claim would fail under Arneson, River's Edge, as well as Hernandez v. Caldwell Banker, both of which rely on Raritan Steele. As I understand your honors hypothetical for the fundamental reason that I am not looking at a title opinion and making my decisions based on that title opinion, I am taking it secondhand from what you, the seller of the house, tells me. Well, what if the title insurance company gave it directly to you? Then would it be a Raritan claim? It would be more in line with Raritan. But, again, to be clear with what's pleaded here, that's not alleged. All right. Thank you. Okay. Thank you. Thank you.  Yes, sir. Just give me a moment. I'm sorry. Mr. Armstrong. I'm sorry. Just give me a moment. Go back to that hypothetical. The answer is yes, there would be a claim. And the reason is because it's the same information that's passed along from the title company to you that you would then turn around and pass along to the buyer, the potential buyer. So the direct standard that's articulated in Raritan in the restatement second is not direct reliance from the source of the information, as we say in eastern North Carolina, directly from the horse's mouth. Rather, it's the same information. It's direct reliance on the same information. So there is no claim for negligent misrepresentation if title insurance company says, yes, good title, and then you turn around and say something modified or different than that because at that point it's not the same information. But if it's the same information, it can be conveyed through an intermediary and still be a negligent misrepresentation. And that's exactly what the Raritan rule says. To wrap up this discussion on duty before I move on to the alternative arguments about reliance, if the defendants are correct, there's an element of common sense to this. If the defendants are correct in their analysis, then insurance adjusters in North Carolina can say whatever they want and do whatever they want with anyone other than the insurance company with impunity, without any consequence, without, you know, any responsibility for any of the collateral damage caused along the way. Let me ask you about, and I guess this is a follow-up to Judge Gibney's question, why is it that counsel would state that your relief would be in a suit against or a claim against the balances or against legacy? Why is that not the case? Basically that you would be able to sue legacy. I assume legacy could sue NARS or Admiral. And why is that? I'm just interested to see your response to that argument. Well, if I understand your question correctly, Judge Benjamin, any suit between EHC and legacy biogas would be a suit for breach of contract. It wouldn't be a suit for negligence because we have this thing called the economic loss rule. But that's different because here EHC doesn't have a contractual relationship with the defendants. That's why it's a negligence theory. Did that answer your Honor's question? Yeah, but I think what counsel's argument was earlier was that you do have recourse. Your recourse would be against legacy. And I would counter your Honor that there is nothing under the law that limits my client to suing legacy biogas for breach of contract or Admiral insurance for that matter if there were a basis for relief there. Under Raritan, as pled, they have a claim against the defendants. Whether or not they have a claim against anybody else is irrelevant, I would submit. Are the balances still a going entity? I think the complaint pled that they went bankrupt. Okay. So, yes, we're not just engaging in an academic debate here. There's real life consequences. Just back to the statements that were made by Mr. Scruggs to your client, is it true that I think what your friend on the other side says is there was never an affirmative statement that the work would be covered? There were affirmative statements to the essentially ignoring the fact that work was ongoing. There was a failure to say this may or may not be covered. But that there was never an actual affirmative statement made by Mr. Scruggs to your client that their work would be covered by Admiral insurance. Is that right, that there is no affirmative statement that could be the basis of a negligent misrepresentation? Well, the direct statement Admiral will pay the cleanup costs was made through legacy biogas. But understanding that context when then they have subsequent conversations which are direct, which says let me check on payment, there's context with those statements, right? We don't have to reaffirm that coverage is going to be made. That's already been established, and now we all understand that, which is why we're saying let me follow up on payment. So the context of it all is what, you know, and again, it doesn't have to be a statement directly from the source under the Raritan rule. As for reliance really quick, there's an element of common sense here. Complaint does allege actual reliance. It does allege direct reliance on the same information, not the same source. And these folks, upon that information, directly rely by being out there 24 hours a day, two days and then another week and a half. Your Honor, may I finish my statement before we finish? Yes. And so they relied on the initial representation of coverage and the subsequent representations tied to that initial representation to pump hog waste. And it's not an academic debate. With the boots on the ground, what they were told, they had no time to go knock on corporate headquarters at Admiral Insurance to find out or get a written coverage opinion or whatever. They had to act on the information that they were given at the time. And Mr. Scroggs understood that. Thank you, Your Honor. All right. Any other questions, Judge Burner, Judge Gibson? No. All right. Thank you. At this time, once again, I'm apologizing. I'm not there to walk down and step down and shake your hands, but at this time, Judge Burner and Judge Gibson will step down and greet you. Thank you.
judges: DeAndrea Gist Benjamin, Nicole G. Berner, John A. Gibney Jr.